We will proceed to our next case, which is No. 24-1939, and accompanying numbers, AbbVie v. Brown. We've got lots of lawyers, but we'll be happy to hear from Mr. Owen to start. Thank you, Judge Richardson, and may it please the Court. Matthew Owen on behalf of AbbVie. You will hear three arguments from the appellant's side this morning, and we've done our best to divide coverage of the various issues in this case. But I'd like to start, absent other direction, with two. The first is to explain why the Maryland statute compels manufacturers to sell, at discounted prices, their drugs to covered entities and contract pharmacies under circumstances that federal law does not require, which has both the consequence of taking a private property and also an alteration of the terms and conditions of participation in federal Medicare and Medicare programs, and therefore preempted. The second is to explain why the Maryland statute, like the West Virginia statute, sets up an alternative and preempted system of enforcement in State court of disputes and rights that are committed by Congress and by the Supreme Court's decision in ASTRA to the exclusive competence of HHS and its Administrative Dispute Resolution Tribunal. So, taking the first issue first, the Maryland statute provides that a manufacturer may not directly or indirectly deny, restrict, prohibit, discriminate against, or otherwise limit the acquisition of a 340B drug buy or delivery of a 340B drug to a pharmacy. In the record below, the State admirably, I think, acknowledged at JAH... Pharmacy under contract with a covered entity, right? Yes, that's right, Your Honor. Not just a pharmacy on its own dime, but for a covered entity. That's exactly right, Your Honor, but it's important to understand, I think, that manufacturers' policies in order to comply with the federal 340B statute must offer to sell to covered entities drugs at ceiling prices, but they are allowed under the 340B law, as the D.C. Circuit and the Third Circuit have recognized unanimously, to impose reasonable bona fide conditions. One of those can be that if you don't agree to a one-contract pharmacy policy or a claims data requirement, we don't have to sell our drugs at a 340B price at all, not even to a covered entity. And those courts said it's because the federal statute is silent, right? That's what the courts have unanimously said. The federal statute in question is a spending clause requirement, a spending clause legislation, and so what it does is it says, what are the things that manufacturers have to do in order to participate in a federal program? And because it is silent as to this sort of unlimited contract pharmacy obligation, that means manufacturers don't have to agree to that in order to get access to Medicare and Medicaid. They only have to offer 340B drugs on bona fide and reasonable terms. So your line there effectively is the Third Circuit says silence doesn't speak, but the D.C. Circuit seemed to say a little bit stronger that silence actually does speak here, that it actually gives or retains the manufacturers their inherent right to offer the sale of their goods on their own terms, except as limited by the 340B program. Except as limited by the 340B program. What these state laws do is say, well, actually, no, you have to sell more. To a covered entity, if they're going to allow it to be acquired by a pharmacy or by a pharmacy directly, what the statute requires in these states is that we sell drugs at a confiscatory price under circumstances. Does it matter whether you have to sell more, right? I mean, that might be factually true, but if everybody was doing what they were supposed to be doing, acknowledging that might not be true. Would your preemption claim turn on whether it requires you to sell more or just that it requires you to sell it or deliver it to 50 different places rather than one place? Because as the state acknowledged below, these are attempts to control our offer in the first place and not just back-end delivery conditions, and that's quite important. It's at JA-868. What that means is that if we have to sell more drugs to a third party, another private company, at confiscatory prices, it means A, that's a taking, and B, it's not voluntary because we didn't get any state benefit from either, you know, from Maryland in exchange for that property. And third, that means that they've raised the price of admission to Medicare and Medicaid. If I could very briefly address the enforcement issue. In Astra versus City of Santa Clara, the Supreme Court made clear repeatedly that the jurisdiction of the ADR Tribunal to adhere overcharge claims is exclusive. 42 CFR 10.21, which post-states the Eighth Circuit decision in McLean, defines overcharge to include any claim by a covered entity that a manufacturer has limited its ability to purchase 340B drugs at that price. That's what our policies do. If you don't agree to a one-contract pharmacy or claim state limitations, you can't purchase them. Thank you. Thank you, Counsel. Good morning, Your Honor. Mr. Perry, tell us what you're going to talk about. I feel like this is speed dating or something here, but tell us what you're going to talk about first and then tell us. May it please the Court, I'm going to start with A-1 of the federal statute and then the two particular cases, Santa Fe and Novartis, that Your Honor has just mentioned. A-1, of course, creates the obligation to provide an offer of a federal discount. It's a provision that is solely found in federal law. Maryland cannot and has not done that. In 2024, the D.C. Circuit in the Novartis case addressed exactly how that obligation applies in a contract pharmacy context. And here's why that's important. It shows exactly what the State of Maryland is trying to do here, and that is create an obligation to provide this pricing on transactions where it wouldn't ordinarily apply. Well, I'm confused by that because in the D.C. Circuit and in the Third Circuit, your clients called this a delivery condition. They said, we have contracts about delivery conditions. And the D.C. Circuit and the Third Circuit called them delivery conditions, referring to the number and kinds of contract pharmacies to which you would ship drugs. Delivery conditions. But then in front of this Court, the exact same requirement, you're saying, well, when we do it, it's a delivery condition. But when the state does it, they are regulating pricing. They're requiring us to sell more at lower prices. So explain that difference to me. Sure. Both of the two statutes, the state and the federal, regulate both delivery and pricing. And you can see delivery addressed in Section 4 and Section 5 of the Novartis decision. And let me, if I might, just walk through the two critical holdings in that decision. Can you answer her question first? Because I took her question to be more fundamental, right? Not about the statute, not about the decisions. The point is, in those cases, your clients argued a position that is directly in contrast to the position you're arguing here. I don't think it's in contrast, Your Honor, because both things are regulated by both statutes. So you can say these are both delivery issues regarding contract pharmacies? You said that the federal statute does not regulate delivery. Like, that was your whole argument in the D.C. Circuit and the Third Circuit, and you won. And now we're here, and you're saying, well, this is actually not about delivery at all. It's about price. And even though the statute from Maryland doesn't mention price, it's really about that. There is a really key distinction that I'd like to point out, and that is that the D.C. Circuit case and Sanofi, Third Circuit case, were about universal obligations to deliver. All right? Unlimited number of contract pharmacies. They were not about the question of whether some incidental delivery policy is or is not illegal under federal law. Both of those cases, if you read them carefully, they're about silence and whether the federal government can impose a universal delivery requirement. They can't. It was about universal delivery in that case, and that's what we were talking about. So what's different here? Well, there's two holdings. This is not universal. It's just Maryland? No. The question here is, what can you do in a federal offer? The second holding in Novartis addresses that very specifically. What is permissible? No, the question here is about what can Maryland, what's left to Maryland to regulate about pharmaceuticals within its borders? Well, I will show you in their brief where they admit that what they're trying to do is change the federal offer and compel you to make drug sales that you're not required under federal law to make, but it turns on what happens in Sections 4 and 5 of Novartis. And in that case, what the court said is one contract pharmacy limitation is okay. That's an appropriate limitation on your federal offer. Claims data precondition, okay, that's an appropriate limitation. Yeah, they said that's okay because the federal statute is silent. We're talking about Maryland has a statute that says it's not okay, and can Maryland do that? It's not silent, Your Honor, because the- That's what the court said. But what they were talking about there is universal delivery. This is a specific- No, but I thought your answer was going to be different. I thought what you were going to say is that in the D.C. Circuit case in particular, the Third Circuit's a little more ambiguous, that the court says that this silence preserves rather than abrogates the ability of sellers to impose those obligations. And because it's suspending clause legislation, right, when that silence in preserving that right means that nobody, neither the feds nor states, can like require that of the manufacturers. And exactly, and here's why that's important. The position that states cannot add any requirements to Medicare or Medicaid, no Medicare or Medicaid regulations by states. This is different than Medicare or Medicaid. 340B, you would agree with that statement if instead of Medicare or Medicaid, the question was that they can't add requirements to the 340B program. Yes, and let me explain exactly how this plays out, if I might, in this shall offer requirement. The key here is that if I employ as a drug manufacturer a contract pharmacy limitation, a claims data precondition, I have satisfied my obligation to make an offer. I've discharged my obligation to make an offer. The state is coming in and making me do something different, and they admit it. And they admit it on pages 54 and 55. Can I ask you a different question? I know you're out of time, and I don't know whether this is your area, but you're stuck with it one way or the other. Imagine a state had a generally applicable law, and I'm really asking about field preemption, not conflict preemption, so keeping it in that sense. But they had a generally applicable law that says if a contract involves more than a million dollars, it has to be notarized, right? It's a made-up law. It doesn't exist, right? But bear with me. If that law existed and you came in and challenged that law with respect to the 340B program, would it be preempted? It depends on the law, but there are different rules when you're specifically targeting. No, no, I understand it would be different if I gave a different hypothetical. But that's not actually an answer to the question, right? So what I'm asking is, is that law, would that law be preempted as it applies to the 340B program? If there were a generally applicable law, like you explained, that is not targeting a very specific federal program, not trying to change your obligations on a federal program, the preemption analysis could be very different, and you might be right. But here is what's happening. Wait, wait, no, no, but that's – all right, so that's just a duck of the question again in a different way. Well, the analysis would be different, and you might be right, as to not actually engage in the question. So let me maybe ask a different way. Do you think that that notarization requirement would bind the ADR process? In the ADR process, if there was some dispute involving a contract and the manufacturer or covered entity came in and said, ha, it wasn't notarized, would ADR be bound by that obligation? I am not seeing in your hypothetical something that conflicts with the statute, with the federal statute. But here what conflicts with the federal statute is what the state has admitted on pages 44 and 45. I totally get you want to make a different argument. Maybe just for a minute, try to answer this question, and then I'll stop. I'll assume that you don't want to answer it anymore. If you don't want to, that's totally fine. Would the ADR process – so if there was a dispute in front of the ADR panel and this requirement of notarization existed, would the ADR panel be bound by it? There is a regulation that answers your question. And what is that regulation? It is 42 CFR 10.21A1, and what it says is the ADR panel's special proceedings govern any effort to limit the availability of 340B pricing. I don't take your hypothetical as fitting in that box. That's, I think, the very precise answer to your question. It doesn't seem that your hypothetical conflicts with the federal statute. All right, but here's the point, if I might, Your Honor, on pages 44 and 45. I'm sorry. That's fine. You don't have to answer. That's totally fine. Go ahead. Actually, your time's up. Thank you very much, Counsel. Thank you. Good morning, Your Honors. Jessica Ellsworth for Novartis. The 340B statute creates an exclusively federal scheme, as we've been talking about, for manufacturers to offer discounted prices to particular entities while preserving manufacturers' ability to set commercially reasonable terms in doing so. Congress requires Novartis to participate in this program and sign a pharmaceutical pricing agreement that specifically sets out Novartis' responsibilities for participating in the program. Can I ask a follow-up about what preserves this right of the manufacturers? My understanding from the argument is it's the silence. The silence preserves the right of the manufacturers to fill in all the blanks. I think that's right. Judge Richardson- It's not because it's so comprehensive. It's not comprehensive. There's so much silence. There's very few things required by this program, and then there's a lot of silence. And the manufacturers' only argument is it's the silence that preserves this realm for us, and no one can regulate it. So I don't think that's quite right, Your Honor. The argument is that there is a federal program that Congress created as a condition to participating in Medicare Part B and Medicaid. And Congress said, this is the size of the program. These are the manufacturers' responsibilities to participate. Manufacturers like Novartis said, okay, we're going to participate in the program on these terms. Maryland has decided these should not be the terms. The terms should actually be bigger. The subsidy that Novartis provides should be larger. And so Maryland wants to change the terms of what is required to participate in this program. The requirements are set out. They are comprehensive as to the program, and that's what the Supreme Court recognized in ASTRA. This is intended to be a uniform program. It has a uniform enforcement system, and that is what Congress wanted. So in ASTRA, in the D.C. Circuit decision, in the Third Circuit decision, in this case that involves preemption, in all of them, the through line is what did Congress intend when it created this program. And it intended a program to be a certain size and run in a certain way. And Maryland's law wants to unilaterally broaden Novartis' responsibilities in the program. It wants to expose Novartis to additional enforcement mechanisms that the federal program does not have. And it wants to limit Novartis' ability to use things like a claims data requirement in order to actually advance. I thought the intent of Congress was to stretch the resources. Yes, Your Honor. I thought the intent of the statute under 340B was to stretch resources to areas. But it seems as if your argument is to limit this thing. So, Your Honor, there is a balance. And it's important, I think, to note that this program ran from its inception all the way through 2010 exactly in the way that Novartis' policy works today, which is that if you are a covered entity and you do not have an in-house pharmacy, you can use a dedicated contract pharmacy, one of them, for Novartis to be able to offer you drugs at this discounted price and for you to be able to take advantage. But this program is a balance that Congress struck because one of the things that the program is designed to do is to make sure that there are not duplicate discounts given. So when you get 340B pricing, you don't get Medicaid rebates. There is a balancing that goes on. And HRSA is the agency that is set up to effectuate that balancing. That's what ASTRA recognized. It has to be done with an entity that has an eye across these programs that are collectively operated. I do want to ask someone and follow up to Judge Rushen's question regarding your co-counsel. It almost seems like your arguments here today conflict with the arguments you made before regarding reading into, not reading into Congress' silence. It almost seems that there's some conflict between the arguments that you made before the D.C. Circuit and these arguments that you're making here. So, Your Honor, I'm glad that you've asked that because I want to clear up that I do believe there is no conflict at all. The argument in the D.C. Circuit was that an offer is allowed in the federal program to have price terms and delivery terms. That can be the way the manufacturer structures their offer. What the Maryland statute does is it says that an offer cannot have what it calls delivery terms. Delivery meaning that a drug on the invoice is invoiced at a certain price. And you can see that because of the way the Maryland statute defines 340B drugs. So the statute itself is linking the delivery to price. This isn't about refrigerated trucks. This isn't about certain hours of the day where deliveries have to occur or packaging that a product has to be in. This is about the price. And the way you know this is because the main... This is about exactly the thing that the D.C. Circuit case and the Third Circuit case was about, right? It's about the contract requirement you want to have that says we won't deliver to these pharmacies. We'll only deliver to one, a 340B drug. We can call it price. We can call it delivery. But let's all agree it's the same thing as what was going on in the D.C. Circuit case and the Third Circuit case. It is, and the argument is the same argument, which is that manufacturers have the flexibility under the federal program to set the terms of the offer in this way. And now the argument, it sounds like, is because it's spending clause legislation. That's the argument that's being made now. The preemption is different because it's spending clause legislation. So you're right. It's always been spending clause legislation, and I think that is why the D.C. Circuit said in the sentence that follows the language about silence on delivery, Judge Rushing, you actually quoted it, that that silence in this kind of statute means that the flexibility is preserved for the manufacturer and not abrogated. And so that's why it's very important. I see my time is up. Can I ask one more question? You can ask as many as you want. This is complicated. I get why in the context of the federal regulation, the federal statute, that a court would say, well, if it's silent, that preserves a realm for the manufacturer. Because that is the bargain that they agreed to with the federal government when they accepted federal government's terms. What is your best case, your best example for the argument that that also preempts any state legislation on, you know, anything in the neighborhood of the topic?  Like states can regulate pharmaceuticals, but they can't regulate 340B pharmaceuticals because the federal government and the manufacturers have an agreement. So, Your Honor, can I give you two answers to that question? Because I think there are actually two answers. One is a field preemption answer, and one is a conflict preemption answer. The field preemption answer is that this statute is simply an adjustment of the bounds of the federal program. It does not seek to do anything other than alter. It wouldn't exist but for the federal program. The only thing it's doing... Well, yeah, but that's true about lots of things that wouldn't be preempted, that it doesn't exist but for the federal statute. Like there's Dublino, where there was a federal benefits program, and the state added a work requirement. And the Supreme Court said, that's fine. It wouldn't exist without the federal program, but, like, that's fine. But do you have a case where it's because it's a spending clause, like a bargain handshake between, you know, the private entity and the federal government that, therefore, we do a sort of different preemption analysis or that factors in? So, Your Honor, I have that case, and I'm going to give it to you in rebuttal because I do not have the name at the tip of my tongue. Oh, I'll be on the edge of my seat. If I can also tell you just the conflict...  Buckman is a good one. It isn't the one that I was thinking of, but I think Buckman is an excellent one because it also does... To make this point, I believe there is one other that is focused on the spending clause legislation piece of it. And so let me get that for you. On the conflict preemption, just to say very clearly, I think there are four ways in which there is a conflict here. That the Maryland statute is an obstacle to effectuating the purpose Congress set out in balancing all of the various needs with 340B and Medicaid. And the four reasons are that there is allowed to be one contract pharmacy limitation that a manufacturer imposes under federal law. The second is that a manufacturer is allowed to ask for claims data in connection with claims. The third is that the federal enforcement scheme, ASTRA tells us, has to be uniformly effectuated by HRSA. And the fourth is that the remedies are set out by the federal statute. And there is no indication, unlike in Medicaid, that there is any role for the states to play in that. And that kind of sounds like saying it's an obstacle to the purposes and objectives of Congress because Congress preempted the field. I mean, that's kind of the same argument. Those aren't... Well, this court has said that the two, conflict and field preemption, can be mutually reinforcing the principles. And I think that is the case here. So you can come at it in either direction. It leads you to the same point at the end. Thank you, Your Honors. May it please the Court. Your Honors, Maryland's HB 1056 withstands all of the appellant's various constitutional attacks. First, because HB 1056 regulates only the delivery or distribution of drugs. It is not preempted by the 340B statute. That statute regulates the prices at which drugs must be sold to covered entities and is entirely silent as to delivery. Next, there's no takings because, aside from the drug companies' voluntary participation in the 340B program, there's no transfer of property in any way not contemplated by the statute. And the drug... Can you just... Sorry, I don't mean to get you off track. I'm happy to jump in. Why do we think that it's voluntary in that sense? Because if you're a manufacturer here, you agree to enter into the 340B program, which is the federal program. But then as a result of that choice, which is voluntary, or at least arguably voluntary given the size of the market that you're being let into, every state can then, like, tack on sort of whatever it wants to, including inconsistent obligations with respect to what you're calling the delivery piece. So one state might say you can only have one. Other states might say you can have as many as you want. Some states might have different requirements than others. Why does their agreement to the federal program constitute an agreement to sort of the state additions to that program? Well, I think it's a theme that is threaded throughout every issue here, and that's the silence in the statute. The silence that... Well, but the silence doesn't get you the agreement, right? So they agreed to the 340B program. And the 340B program, whatever we want to call it, it's in a federal statute, right? But in no way it doesn't seem like to me that they agreed to any state addition to that program, right? Because there was no... Like, they were in the program before you passed the statute. They've stayed in it. Maybe you say there's like an implicit agreement there, but the agreement is with the feds, right, to enter that program. Why do we think that's an agreement to your state obligations? And what's the consideration that you're providing? You're not giving them anything for these additional obligations, right? This is just a pure punitive statute. Well, that's... I disagree that it's a punitive statute, but it provides... Can you be forced to pay a fine and go to jail? That seems like a punitive statute. Yes, it's punitive. I thought you meant in the purpose, in the substantive requirements. But certainly there's an enforcement requirement if you don't comply with the requirements. But it's silent. But that's distinct from like a spending clause voluntary engagement, right? So, like, nobody says the federal 340B program is punitive, right? They have to make the choice. Do they want access to this massive market that exists or they don't? And there's a trade-off that they make, and they look at how much money the 340B program is going to cost them, and they sort of make a balance, and they say, it's worth it to be in this market, right? That's a voluntary process. And then you come in and say, whatever balance you thought you drew, you now have to draw a different balance because we're going to add obligations to the program. But I think the issue was touched on with regard to what are those obligations. Those obligations could be anything that relates to an offer. So, your point is the state can do anything that relates to an offer? Whether silence as to what the offer is, the state can step in in a way that does not conflict with the purpose and objectives of the federal government. So, you would agree, like, for example, that if the state said, you cannot request an audit under the 340B program, that'd be preempted, right? And so, just to make sure I understand, and this is sort of, I think, back to Judge Rushing's point, that the question sort of comes back to, in your mind, if the 340B program says it in it, like requesting an audit, then the state can't do it. But so long as the 340B program doesn't require a given thing, right? Then the state can add to that in any way it chooses. I would agree with that in principle. Yeah, I wasn't trying to be too specific. Right, but I... And then can I just ask one more question, and then I'll shut up, I know they have questions too. So, can you tell me why I should read Novartis or forget Novartis? Like, why I should, like, read the statute in this sort of spending clause legislation for that silence not to, like, actually speak? I know there's a great line at the beginning of the Third Circuit opinion that says silence doesn't speak, but I'm not sure that holds when you read the rest of the opinion. We sometimes open opinions with interesting lines that don't hold with the rest of the thing. But certainly, in the D.C. Circuit, the court seems to say there that it's not just that it's mere silence, and so there's no guidance one way or the other. But instead, that silence actually preserves the pre-existing right to make an offer under terms that you wish with the product that you're selling. I don't read it that way. I read... Can you help me understand why? Because it says this silence preserves the ability of sellers to impose delivery conditions. Right? I mean, like, that means that it's like doing something, right? Like, the court there seems to read that silence as saying, we begin with the baseline principle that if you sell something, you get to sell it on the terms you choose. We're telling you, if you enter this 340B program, that you have limitations on that ability to make the offers that you choose to make. But here are those limitations. And no more, right? You got to do it on price. You got to do it on these things, right? So there are limitations, but that we don't otherwise take away your right to sell your product on the terms that you wish to sell it. I think the appropriate reading of the D.C. Circuit and Third Circuit is that it prevents the federal government from penalizing a manufacturer from putting these delivery restrictions in their contracts. And why does it preserve that? Because there's nothing in federal law that speaks to delivery. So it's a protective. It says preserve. Sort of my gloss on it would be protect from federal government regulation that does not exist, because it doesn't exist. But that silence does not mean that the states cannot step into that void and create their own regulation of delivery, something that the federal government or Congress chose not to do, and the states can step into that void. But if Congress chose... Then I'll stop. I'm sorry, Judge Rushing. I know you're trying to speak. I promise. Go ahead. Actually, I'll just let you do it. No, go ahead. No, I'm not going to do that. No, I'm not going to do that. All right. I just wanted to ask a sort of basic backup question. We're talking today as though the manufacturers get to decide whether to enter the 340B question. I've read the briefs, or 340B program. I read the briefs to agree that if manufacturers participate in Medicaid and Medicare Part B, they are required to participate in the 340B programming. The manufacturer's brief says, in exchange for participation in Medicaid and Medicare, the federal government requires manufacturers to provide 340B drugs at these low prices. That is my understanding. I suspect my colleagues might have a more in-depth understanding of that relationship. Could a manufacturer say, I want to participate in Medicare and Medicaid, but I'm choosing not to participate in the 340B program because I don't agree to its terms and conditions? I don't believe that that's a choice. In other words, the incentive to join the 340B program is we will give you access to Medicare and Medicaid markets. Right. That's the spending legislation where we say, if you want to get reimbursement from Medicare and Medicaid, you have to agree to this 340B program. But it is voluntary in that sense. They could choose to not enter the Medicare and Medicaid market, and then they would not be burdened with the obligation of the 340B program. That's correct. Does Maryland at all cooperate with the federal government in Medicare and Medicaid, or is it solely a federal program? I think you're getting a little bit outside of my knowledge base, but I believe Maryland. Let me help you. It obviously does. It obviously does. The question is, in those instances, does the Medicare and Medicaid statutes specifically provide for state involvement? And I'll just tell you the answer to that is yes. Right. The question is, does the 340B program include any reference that gives states roles in the 340B program as distinct from Medicare and Medicaid as a whole? I don't believe there's anything in 340B specifically. Is the 340B program a benefit that's provided only to Medicare and Medicaid patients, or, in fact, it is unconnected to Medicare and Medicaid patients? It only asks whether you're a covered entity patient. That's my understanding. And, again, going to the purpose, we haven't, I don't believe, talked enough about the purpose of 340B, which is generally to subsidize these covered entities so that they can remain afloat, so that they can remain their ability to provide these services, their rural hospitals, their local clinics, specialty clinics, that need this federal subsidization to survive and to serve their patients and to expand and continue. Can I just ask this question? Why in the world would a government, and this is not my question that is going to matter here, but why would the government subsidize in this way, like allow manufacturers to charge higher prices in Medicare and Medicaid and then backdoor it through the 340B program to some subset of entities? This seems like a crazy way to subsidize. I totally think the covered entities ought to be subsidized. Why would they subsidize in this way? This seems like a crazy way to do it, doesn't it? Rather indirect. I mean, this is like all the way around. My understanding is that the basis of it is that it takes the drug manufacturers who are making a lot of profits off selling their drugs and redirects some of those profits, redistributes some of those profits to the covered entities through a limited program. And it's limited in the sense that covered entities get, it's only available for covered entities and their patients. $24 billion worth of limited, right? Right, but it's a closed program in the sense that when they talk about we're going to have to give away or sell more of our drugs under this program, there's a cap to it. And that cap is the patients of these covered entities. So there's always going to be a limit in that respect. And that's like what, 5%? Roughly, roughly, Your Honor. And so to pivot to conflict preemption, if we're talking about what does Maryland's law, does it conflict or is it an obstacle with the federal objectives here? The federal objectives, as Your Honor pointed out. Maybe this is the same question, maybe you're getting there, but can you tell me what, what would you have us say about ASTRA? So ASTRA seems to say in a variety of different ways, in effect, that the program is to be administered harmoniously and in a uniform nationwide basis. And we have a, particularly with respect to the ADR process, and we have an ADR process that includes this idea that we talked about earlier in the regulation that our friend read about not selling to certain entities. That's covered in the ADR process. ASTRA seems to tell us the ADR process ought to be the way that we do this because of the complex interactions that we have between Medicare and Medicaid and this 340B program. What would you say about ASTRA? Like, why do you think ASTRA doesn't suggest to us that this differential enforcement mechanism where the AG gets to run around and fine and throw people in jail is, like, inconsistent with ASTRA and its understanding of the 340B? Well, aside from the theme of silence, the other theme is that there's a... Well, but that's not silence, right? So ASTRA says, ASTRA doesn't say silence. Like, ASTRA says there's an ADR process, and it says we want a single way of doing this, and, like, if you're trying to do this some other way, that's improper. That's not silence. I understand the silence argument in another context, but that's not... Silence doesn't seem to help you in ASTRA. My apologies. I was merely saying that there are two themes in this case. One is silence, not applicable here. The other theme is a difference between pricing and delivery. So Maryland statute is about delivery. 340B program is about the pricing. And what was at issue in ASTRA was the ADR program about pricing in the context of diversion, the rebates. So, but that doesn't seem like, to me, that that, like, helps you. Because we know the ADR process includes claims for failure to sell to a given entity, right? That's part of the ADR process. Just like the price is part of the ADR process. So why does that help? Why do you think ASTRA, when it said we should have a single way of doing this, why do you think ASTRA is limited to price? I mean, it talks about price, but it talks more about, it seems like to me, this sort of overarching single uniform nationwide system of enforcing the 340B program. We don't want a bunch of, in that instance, private plaintiffs running around like yahoos. And you might say, we don't want a bunch of state AGs running around like yahoos. But my understanding is that there aren't a lot of issues with drug manufacturers refusing to sell to covered entities or refusing to sell to pharmacies. That's how they do it. But you agree it's covered by the ADR process? With regard to the pricing and with regard to diversion. That's my point there. Why do you think it's limited to those two things? Why is that? If they just refuse to do it for, they didn't think they were a covered entity, right? All of that is subject to the ADR process. They refuse to sell outright? Yeah, because they think this isn't a covered entity. The covered entity thinks it is. Somebody has to resolve that question. The covered entities aren't listed out by name. There are categories. Maybe there's some confusion about it. That question would be resolved in ADR, right? I'm just not aware that that's happening, because I think the drug... It doesn't have to. My question is, if it happened, it would be resolved in the ADR process. That's what the Fed Red says. That's what he just quoted to us, right? I think it was Mr. Perry? I suppose because it would be a baseline refusal to make an offer at all. And I suppose that's covered in the fundamental nature of the federal statute is that they must make an offer to covered entities to sell their drugs. So why doesn't that same idea apply when it says they made an offer, but the offer was limited to a single contract pharmacy? That too seems covered exactly within the ADR process. And instead, you want that to be a question not decided by ADR, but instead by 50 different state AGs who apply different bars and lines and standards to doing so. Because under the failure to make any offer context, which I understand your question to be, that's a violation of federal law. But the violation of the terms of that offer or that the offer wasn't good enough is an issue if it relates to delivery under Maryland law. Because that statute is silent as to delivery, which allows Maryland to come in and regulate that aspect of the program or of that transaction. And so they're distinct. And that's the theme I was trying to get at is that the ADR program, the 340B statute relates to pricing and disputes about pricing, whereas Maryland's enforcement mechanism only comes in if there's an issue with delivery or the refusal or denial of delivery. Can you help me understand this idea? Generally speaking, when we talk about price, it includes not just the numbers that are on it, but it's like the obligations that have to go with it. So imagine the story was you're a covered entity and you say, all right, I've got 1,000 units, but hey, manufacturer, I want you to deliver them to 1,000 different locations. I think we would say that's more expensive for the manufacturer to do than it would be to deliver to a single location. Is that fair? Yes. And so why isn't that also sort of part of this story here? The manufacturers, they're not really sort of leaning on this heavily, but in part what they're saying is you're telling us to deliver to 1,000 different pharmacies and part of that might be shipping costs, but the real problem is with identifying and testing for diversion. Because if we have to deliver to one pharmacy, we can really focus on whether they're diverting these drugs to the wrong places. But if we have to deliver them to 1,000 pharmacies, it's impossible for us to determine who needs to be audited and when. And so why isn't that sort of a fundamental idea that that is an effect about price? Because you're interfering with their ability to cost-effectively identify what they should be doing. I think these highly contextual questions go also to the fact that this is a facial challenge and I think that that might be better resolved. All right, totally fair, but answer the question anyway. Well, I think one of the answers is I don't think that's realistically how it looks on the ground because I think that the drug manufacturers are delivering to all of these pharmacies anyway. Remember, outside of... Well, but they're delivering non-340B drugs, right? What their concern is, right, is that they're delivering 340B drugs to a pharmacy in Hawaii and they have no idea whether that pharmacy is like actually serving your patient or not. And it's almost impossible for them to cost-effectively determine it. The question of whether they're serving their patients or not, that would be a question of diversion, again, in the federal context. But again, I believe that... But you understand it's harder if you're the manufacturer. I mean, just like real world, it's harder to identify whether diversion is happening the more dispersed the pharmacies are. If you've got a thousand pharmacies, it's hard to keep track of whether they're diverting. If you had a single pharmacy, it'd be much easier to identify when diversion has happened. I mean, that's not a crazy idea, right? Not at all, but the answer is that's what the federal scheme is for. I see my time is up. I'm happy to... Wait, wait, why is that what the federal scheme is for? Because it seems like to me the federal scheme has sort of answered that question and sort of said, and now we're just sort of full circle, but has answered it by saying, you know, they have the right to do that, that the federal system preserves that right. I would disagree. I think that the Johnson case and the Third Circuit case talk about the silence, and it talks about the ability of the federal government vis-a-vis their regulations to penalize drug manufacturers for refusing to send their drugs to contract pharmacies. But because there is no such language in the law, the D.C. Circuit, Third Circuit, said that you cannot penalize them for that. But that doesn't mean that the states can then step into that void, into that silence, regulate in their arena, and have a separate enforcement mechanism for that sliver... Can I just ask one more question? I mean, what the court says, you know, whether you think it's right or wrong, I mean, maybe you just think it's wrong, but it preserves the ability of the sellers to impose conditions. You want the opinion to say not that, but instead it prohibits the feds from punishing, right? But those are different in the way that we're really talking about here, right? So, like, if it merely prohibited the feds from punishing, that's a different question than preserving the seller's ability to impose, right? These are the two sides of the coin. The question is, is the silence doing anything, or whether it's merely silence? But it preserves it under that landscape that existed under federal law, in the sense that if the statute is silent and the federal government can't regulate it, that aspect is preserved and not affected by. And I know I'm using different verbs, but that's my understanding of it. Thank you, Your Honors. Now we have true speed dating. I'll just start by saying you should talk to your clients about having a single lawyer do these things. This is, like, not terribly helpful to have this disjointed, three different people with different ideas about what they're talking about. But we're happy to hear a little bit from you, Mr. Rowland. I'll do my best, Your Honor. I want to address a couple things that don't turn on the issue about silence that we've been discussing. The first is, very quickly, to address this scope of the ADR rule that, Judge Richardson, that you discussed with opposing counsel. The language of the rule, again, is 42 CFR 10.21. It absolutely covers any limitation on the ability to purchase a drug at a 340B price. The only thing that these statutes do is provide a cause of action for an attorney general to sue a manufacturer about limitations on the ability of covered entities and their pharmacies to obtain 340B drugs at that price. If there were any doubt about this at all, it's in the record at JA 582. This is very helpful. There is a comment letter on the ADR rule submitted by covered entities, and at the bottom it says they urge HRSA to retain that formulation that we've read to you precisely because it will allow the ADR panel to exercise jurisdiction over these kinds of conditions on federal offers. In other words, the entirety of this statute, everything that the states are trying to funnel to the state court, is supposed to go to the ADR panel, and ASTRA says it's exclusive. As for another issue that has nothing at all to do with preemption, which is the takings claim that we have, the state's defense is voluntary participation. And again, Judge Richardson, as you explored with counsel for the government, voluntary participation in a federal program cannot mean that any state can say, well, as long as you participate in a federal program, we can take your property. And if you read the statute, and the text of the statute, and not its kind of generalized gestalt is what really matters, there's two provisions I would point you to. The first is A4 Romanet 2, which makes clear that the statute's definition of 340B drug, quote, includes a drug that would have been purchased, but for the limitation in subsection C, which is why in the red brief, pages 54 and 55, they say the purpose of this law is to compel the completion of transactions that would otherwise not have occurred. They say it twice. That means they agree this statute, which again in section C1 says we can't deny the acquisition of our own property by somebody else. That's like a double negative way of saying we must allow it. And that's how you know that this statute compels transfer of our property in exchange for nothing. One question. You said in exchange for nothing. Yes, Your Honor. Because... It's not... I mean, the pharmaceutical companies aren't making the argument that they're not receiving anything. You're saying nothing. Well, actually, Your Honor, I want to be very clear about this. It has to be that we're... In order for the voluntary participation defense to our takings claim to have merit, the state of Maryland, not the federal government, would have to give us something. There's a good opinion by Judge Shrinivasan for the D.C. Circuit called Valancourt, which describes it as you need to identify an incremental benefit that you got in exchange for giving up your property. Maryland, I think, has conceded they don't provide us any benefit. Congress does, because Congress gives us access to Medicare and Medicaid patients. And they say if you want to do that, that's the dog, right? And the tail is supposed to be the 340B program. If you want to have access to all these patients, that's what you get, but you give up something smaller. You have to give up some of your drugs. Now, the effect size, which the record is very clear about, of these policies that the state wants us to force to have is to transform the 340B program into something bigger than Medicare Part B and Medicaid. In other words, the tail wags the dog under their conditions. But our observation is that in order for the state to say you cannot bring a takings claim because of voluntary participation, the state has to provide us something to buy our drugs with. And they haven't provided anything. All they've said is if you've participated in a federal program, not ours, you must not deny someone else the acquisition of your own property at a confiscatory price. And that's a taking, even if whatever the court may think about preemption or any other claim, whatever means a state may choose to effectuate economic regulation, it cannot be like the Horn v. Department of Agriculture Raisins case that just in exchange for doing business in the state, you have to give your property to someone else and let them dispose of it in exchange for pennies. That's a taking. They can't do that. But when you have to show some type of economic impact, some loss of, I guess, millions or billions of dollars? Well, there are two responses to that, Judge Benjamin. The first is no because it's a physical taking. That is, the statute, this is Horn v. Department of Agriculture is a clear case on this, and so is Cedar Point from the Supreme Court, that there are two kinds of takings claims. One is if it's a physical taking, that is if the plaintiff loses the right to dispose of their own property. Like in the raisins case, that was what happened, and the court said that means it's a physical taking and we don't ask about economic regulation effects because the Constitution is concerned with means and not just ends. So if you command someone to let someone else acquire your property and acquisition means they own it, they have the right to dispose of it, that's the language of Horn, then you don't have to make any further showing. And in Horn itself, the state made the same argument that, well, because we let you do business in the state, that's the benefit that you get, and so you voluntarily participated and waived your takings claim. And the Supreme Court said, no, transacting in raisins is something you could already do, that you can't hold that hostage to be ransomed by the waiver of constitutional protection. That's the first answer. The second answer is, even if we did have to show some more economic effect, the record here is very clear. This cost, that's why they're so interested in it, it costs billions of dollars annually, and the way that those billions of dollars are generated is someone acquires our property for a penny, sells it to patients, even ostensibly poor patients, at full price, and they keep the difference instead of us. So we know that on the face of the law, what they're trying to do is to... Who gets the difference, just as a factual matter? If that happens in the pharmacy context, who gets the delta? Does the pharmacy just have a contract with the covered entity and the pharmacy keeps part of it and gives the covered entity part of it? That's totally a question of private contract between them. That is exactly right, Your Honor. What happens is that... That's exactly right, Your Honor. What happens under the 340B program is... In these contract pharmacy arrangements, is that someone is allowed to acquire our property for penny prices at a confiscatory rate, and then they sell them to patients everywhere at full price before they know whether or not that person is a 340B patient, which is pretty important. So anyone who goes into a pharmacy, they pay full retail price for a drug that the pharmacy bought at commercial prices, plus a markup, and then someone remits to the covered entity, the hospital, the pharmacy remits some portion of the spread, and they keep some. The third-party administrator, which often is owned by a pharmacy chain like CVS, they keep some, and the covered entity keeps some. The patient pays full price, and we lose the full value of our chattel to someone else in a forced sale and some other... And that's all the product of the 340B program, right? No, Your Honor. This is important. The 340B program, the federal program, doesn't require us, as Novartis and Sanofi said, to cooperate with this unlimited contract pharmacy arrangement system that gave rise to this model. But the covered entity, what you're discussing, that customers pay full price, the covered entity and its pharmacy pay a penny, and they get to keep all the profits between themselves, that's the 340B program. That's not because of anything the states are doing. Well, I agree in part. I think it is true that that happens under the 340B program, although notice that, you know, no legislation pursues its purposes at all costs, and that's a pretty dangerous purpose for Congress to say that we're going to create a revenue stream, and again, it's the tail, the 340B revenue stream meant to be smaller than the Medicare Part B program and Medicaid to which it's attached merely as a condition. But if you interpret it to say, well, that increases the revenue of one for-profit group. I didn't ask about the purposes. I wouldn't necessarily pursue that line here, but I'm just saying your complaint about, you know, who gets the profits and who's benefiting and who's losing, that's all the scheme that Congress set up, and maybe the replenishment model, which is not regulated by anyone, like that's not a requirement. Well, no, Your Honor. Actually, I think our complaint, to be clear, for the increment of sales that we have to legitimately offer under the federal program, we don't have a complaint about that. But for the incremental marginal extra sales that the State of Maryland says that we must complete, we may not deny the acquisition of these drugs by another person even if we could under federal law. For those sales, because that's not the product of our voluntary participation in any federal program, we have a takings claim about those sales. You're reading that to mean, like, some extra sales that you wouldn't make to the covered entity. That's right. That somehow they're going to require more than your max to the covered entity. It's not, Your Honor, just that I'm saying that. That is on the face of the Maryland statute. That is what A-4 Romanet 2 says. Yeah, I mean, you could read that to mean, like, you refused to deliver drugs that the covered entity was owed. You refused to deliver them to a particular pharmacy. Again, now here I would point you actually to the record below. I think it's at page 861 or 868. We have this exact exchange. Maryland admitted to the district judge below that, no, no, they're not talking just about delivery, that they were trying to control the terms of the offer itself. And that's also the same thing they say at page 54 and 55 of their red brief, which is what Mr. Perry was pointing the court to. At every place, it is true that the government, in some places, would like to say, oh, this is just a regulation of how drugs that have already been sold have been delivered. But that's not so. We actually will not sell them at all. This is our policy. If you, a covered entity, want us to deliver drugs to more than one contract pharmacy, our official policy is we won't sell them. So you can't buy them at the 340B price. There's nothing to deliver. These drugs won't be sold at all. But the problem is that the text of the statute and the admissions of the state say that, no, the Maryland law says you have to sell them under those conditions. It's not just about delivery. And one way you know that is it says acquisition, comma, or delivery. The acquisition both comes first, is set off by commas, and it cannot be superfluous with the delivery regulation. The statute requires acquisition. Thank you very much. Thank you, Counsel. The state's law is not a law of general applicability. It's attempting to control what is and isn't part of a federal offer. That's why we're focused on Sections 4 and 5 of the Novartis case, because as Mr. Owen indicated, if you make a federally compliant offer and the covered entity or the contract pharmacy, the purchaser doesn't accept that offer, you've discharged your duty. There's nothing more for you to do. But here is exactly what the state is trying to do here. It says so on pages 54 and 55 of its brief. It says, its law precludes manufacturers from including delivery restrictions and offers to covered entities for the sale of 340B drugs. It is making illegal the specific types of delivery restrictions that federal law allows you to make. And it says more on page 55. It says that its statute causes,  the completion of purchases that would not have occurred under federal law but for those restrictions. In other words, its statutes, its statute, prohibit, deny, et cetera, that Mr. Owen was quoting, changes federal law. It makes you incur obligations beyond federal law. Thank you, counsel. I have three very short points to make because I know you've heard a lot of rebuttal. The first, Judge Rushing, is the case that I promised you. It's Cummings v. Premier Rehab, 596 U.S. at 219. It's a Supreme Court case from 2022. It talks about spending clause legislation being based on consent. The second point is... So that's not about how preemption operates with spending clause legislation? I think it is. Yes, it's talking specifically about the importance of consent in spending clause legislation. Thank you. The other thing that came to mind as we've been talking today about silence and the D.C. Circuit and the Third Circuit's decision is that silence can really mean two things in a statute, and it's important to distinguish between the two. One is that it can mean the federal law sets a floor, and that's what this court held recently in the Jen Biopro case that's the subject of a 28-J letter in the West Virginia case, and it looked for textual clues that there the federal drug approval process did do exactly that and set a floor. None of those clues in the text or in the history are applicable here. The other thing that silence can mean is that these are the terms of the program, take them or leave them. That's what the Supreme Court held in the Arizona versus United States case. We think that is the way to understand the D.C. Circuit's decision in ASTRA. And then the last point I'd make is just a practical one, and, Judge Richardson, this gets at some of the things that you were highlighting. I looked up yesterday Johns Hopkins as an example of what this statute does and means. Johns Hopkins, on the publicly available database of contract pharmacies, has 186 contract pharmacies, three in Orlando, two in Honolulu, four in Las Vegas, others in Pennsylvania, California, Massachusetts, Michigan, New York, New Jersey, North Carolina, Texas, and several other states. As you pointed out, Judge Richardson, for a manufacturer to understand what is happening at all of those pharmacies, whether the requested 340B pricing has anything to do with actual patients of Johns Hopkins is extremely difficult. That is why the federal program is set up the way it is. Thank you, Your Honors. Can I ask one quick question? Do you have... I mean, I've tried to think of, like, other examples of federal programs that look like the 340B program to, like, try to think about something else, right? Mainly because I'm tired of thinking about what you want me to think about. Do you have any other examples of these types of federal programs? I mean, I tried to think about, like, a 501C3, but you get in the revenue code. It seems a little complicated to think about that as a federal program that you opt into voluntarily and that somehow preempting state law. I couldn't quite make that work. Are there other federal programs that you would at least have me think about? So I have spent a lot of time on that same question, and I have not come up with a good answer to it. I think the best contrast is something like Medicaid, where there is specifically upfront an understanding that states have a defined role to play in how their Medicaid program operates, and there is nothing like that in the way the 340B program operates. Thank you, Your Honors. Thank you, Counsel. Even though we're going to see most of you again, we're going to come down and greet Counsel because we won't see one of you, and then we'll proceed right into our next case.
judges: Julius N. Richardson, Allison J. Rushing, DeAndrea Gist Benjamin